Merrimack
No. 2003-076

RENE R. SMAGULA

v.

TOWN OF HOOKSETT & a.

Argued: July 9, 2003
Opinion Issued: August 25, 2003

*Nancy B. Winneg,* non-lawyer representative appearing by approval of the Supreme Court under Rule 33(2), by brief and orally, for the plaintiff.

*Upton & Hatfield,* of Concord (*Barton L. Mayer* on the brief and orally), and *Gallagher, Callahan & Gartrell, P.A.,* of Concord (*Michael D. Ramsdell* on the brief), for the defendants.

DUGGAN, J. The plaintiff, Rene R. Smagula, appeals an order of the Superior Court (*McGuire,* J.) upholding the defendant Town of Hooksett's (town) rejection of his protest petition. The plaintiff argues that the court erred in excluding property owners in a neighboring municipality from the petition, and in permitting the town to dispute the accuracy of its own tax maps with outside data. We reverse and remand.

The following facts are undisputed or supported by the record. In 1990, the town's planning board amended its zoning ordinances to create Multi-Use District #5 (MUD5), a tract of 3,300 acres owned by defendant Manchester Sand, Gravel & Cement Company, Inc. (MS&G). On February 7, 2002, MS&G requested that the town amend MUD5. The proposal, zoning amendment #15 (amendment 15), would redesignate wetlands within the district and allow for significant development of the land.

On March 11, 2002, the planning board voted to submit amendment 15 to the town's voters. Normally, such an amendment requires the approval of only a simple majority of voters. *See* RSA 675:4, III (Supp. 2002). If, however, a protest petition is submitted within seven days of the vote, a two-thirds majority vote is necessary to adopt the amendment. RSA 675:5, I, II(b) (1996). The petition must include the signatures of either (a) "[t]he owners of 20 percent of the area of the lots included in [the] proposed change" or (b) "[t]he owners of 20 percent of the area within 100 feet immediately adjacent to the area affected by the change or across a street from such area." RSA 675:5, I-a.

On May 7, the plaintiff and a group of landowners (petitioners) submitted a protest petition regarding amendment 15. The town deferred a determination of the petition's validity until after the May 14 vote, at which fifty-eight percent of the voters supported the amendment. On May

22, 2002, the town examined the protest petition at a public meeting. The petition, which was calculated based upon the town's tax maps, purported to include the owners of 31.28 acres of the 151.80 non-government-owned acres "within 100 feet immediately adjacent" to MUD5. RSA 675:5, I-a. The petitioners thus claimed to have the necessary twenty percent (30.36 acres) of the net acreage necessary under RSA 675:5, I-a with only 0.92 acres to spare. Approximately 7.7 of the 31.28 acres, however, were located in the neighboring municipality of Allenstown. At the conclusion of the hearing, the town declared it needed more time to investigate the matter.

The town conducted its own survey of the property abutting MUD5. In a June 12, 2002 memorandum to the town council, town administrator Michael Farrell stated that:

> The Town verified the net area (total perimeter area minus the abutting governmentally owned property) of the 100-foot wide perimeter from the same data used by the petitioners' agent, which came from the official Town of Hooksett Tax Maps. As a cross check, the Town also used data from the Town's Geographic Information System, as well as data supplied from Holden Engineering & Surveying, Inc. The conclusion in all cases was the same. The petition is invalid.

The memorandum also concluded that the 7.77 acres of Allenstown property could not be included within the petition, and that one of the Hooksett property owners was not in fact within 100 feet of MUD5. Based upon these exclusions and new data, the memorandum found that the petition included only 22.02 of a necessary 30.95 acres, and thus lacked the requisite twenty percent. After receiving the memo, the town council voted to reject the petition. Other than the Farrell memo, the record contains no explanation for the town council's decision.

The petitioners appealed the town's decision to the superior court. The court found that the town was correct to exclude the property owners in Allenstown, resulting in property acreage "far below the required 20 percent." In the alternative, the court found:

> [T]he petition is still not valid as the protest petition contains miscalculations of other areas included in the 20 percent. In making his calculations, the Petitioner relied upon the Town's tax maps and scaled from those. The Town, on the other hand, did not limit itself to tax map data but also considered survey and deed information. The Town solicited information from the Petitioner as well as from MS&G. MS&G had engaged Holden Engineering to make relevant calculations which it did using the

1990 Ordinance and relying on actual surveyed boundaries of MS&G's properties, recorded plans, deeds, and tax maps. Based on the sources of their respective calculations, the Court finds that those of the Town and MS&G are more accurate and reliable.

Relying upon the town's figures, the court concluded that the petitioners erroneously included one 0.94 acre lot (the St. Laurent property) within the 100-foot boundary, erroneously reported the area of a 0.23 acre lot (the Bouchard property) as 0.69 acres, and erroneously over-reported the area of a third lot (the Clarke property) by 0.23 acres. Subtracting the difference from the petitioners' reported acreage total, the court found that even including the Allenstown properties, the petition fell below the required twenty percent threshold.

On appeal, we have accepted two of the plaintiff's issues for review: first, whether the trial court erroneously excluded the Allenstown signers from the petition; and second, whether the town should have been permitted to use data outside of the town tax maps to rebut the acreage calculations the petitioners made by using these maps. Both issues present questions of statutory interpretation.

[I]nterpretation of a statute is a question of law, which we review *de novo*. The starting point in any statutory interpretation case is the language of the statute itself. Where the language of a particular statutory provision is at issue, we will focus on the statute as a whole, not on isolated words or phrases. We will not consider what the legislature might have said or add words that the legislature did not include.

*Appeal of Tennis*, 149 N.H. 91, 93 (2003). We consider each issue in turn.

The first question is whether a protest petition may include owners of land not located in the municipality in which the petition is submitted. Both parties cite RSA 675:5 to support their argument. The town cites the requirement in RSA 675:5, II(a) that:

The owners signing the petition shall identify themselves on the petition by name and address, and by address of the property involved, or by lot and map number, or by whatever other means is used *within the town or village district* to identify the land in question, so that the selectmen or commissioners may identify such owners as interested and affected parties.

(Emphasis added.)

The town argues that "the town or village" must refer to the municipality in which the petition is filed. The town argues that by using the article "the" instead of "their," the legislature intended protest petitions to be limited to owners whose property is within "the" municipality. We disagree.

■ The purpose of RSA 675:5, II(a) is not to define the class of eligible petition signers, but to establish a standard by which "the selectmen or commissioners may identify such owners as interested and affected parties." RSA 675:5, II(a). In any case, the phrase "the town or village" could just as easily refer to the municipality in which the property is located as to the municipality in which the petition was submitted. Thus, we do not interpret RSA 675:5, II(a) as limiting protest petitions to owners of land within the municipality in which the petition is filed.

■ The plaintiff, on the other hand, cites the language in RSA 675:5, I-a defining the eligible class of petition signers. Under this subsection, signers must be either "[t]he owners of 20 percent of the area of the lots included in [the] proposed change" or "[t]he owners of 20 percent of the area within 100 feet immediately adjacent to the area affected by the change or across a street from such area." RSA 675:5, I-a. This provision does not require the signers to be owners of property located in the municipality in which the petition is filed. By its plain terms, RSA 675:5, I-a thus encompasses all land within 100 feet of the area subject to the change, regardless of whether it is within the same municipality. Because the legislature declined to impose additional requirements, we will not read them into the statute. *See Appeal of Tennis*, 149 N.H. at 93.

The town argues that permitting owners of property in Allenstown to participate in the petition would create an "absurd" and "unjust" result because persons who do not own land, pay taxes, or vote in a municipality could nevertheless "participate in that municipality's legislative process" by requiring a two-thirds majority vote to enact zoning changes. We have stated, however:

> When an ordinance will have an impact beyond the boundaries of the municipality, the welfare of the entire affected region must be considered in determining the ordinance's validity.
>
> . . . .
>
> Municipalities are not isolated enclaves, far removed from the concerns of the area in which they are situated. As subdivisions of the State, they do not exist solely to serve their own residents, and their regulations should promote the general welfare, both within and without their boundaries.

*Britton v. Town of Chester*, 134 N.H. 434, 440-41 (1991).

■ For this reason, municipalities are obliged to consider the "general welfare" of the surrounding community when enacting zoning regulations. *Britton*, 134 N.H. at 441. Conversely, owners of property, wherever located, may contest a decision made by a municipality's zoning board of adjustment or planning board so long as they have a "sufficient interest" in the outcome. *See Weeks Restaurant Corp. v. City of Dover*, 119 N.H. 541, 544-45 (1979); *cf. Borough of Cresskill v. Borough of Dumont*, 104 A.2d 441, 446 (N.J. 1954) ("To [allow] less would be to make a fetish out of invisible municipal boundary lines and a mockery of the principles of zoning.").

■ In this case, RSA chapter 675 limits the class of interested parties who may sign a protest petition to those owners whose property is within 100 feet of the proposed change. The standard for qualifying under the statute, thus, is ownership of abutting property, and not the right to vote in any particular municipality. Because the invisible boundary between Allenstown and Hooksett does not cause Hooksett's proposed change to affect the abutting Allenstown property owners any less than the abutters in Hooksett, it is logical that non-resident owners should share the same protection against "unwanted or ill-considered changes in zoning ordinances" that residents have. *Disco v. Board of Selectmen*, 115 N.H. 609, 611 (1975). For this reason, we cannot agree that our statutory interpretation will lead to an "absurd" or "unjust" result.

Finally, both the trial court and the town cite Loughlin's treatise on land use planning and zoning, which states, "[I]n all instances, abutters from another community will have no standing to file a protest petition." 15 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, LAND USE PLANNING AND ZONING § 5.11, at 81 (2000). The treatise, however, provides no explanation or citation for this statement. We find more persuasive the reasoning of the Kansas Supreme Court, which has considered this precise issue. Interpreting a protest petition statute similar to ours, the court reasoned that:

> [The statute] makes no requirement of residency or location of property other than that it be frontage property to that property proposed to be altered or changed. It clearly appears that the legislative intent of the statute is to protect all designated property affected, whether located within or without the city adopting the changed zoning ordinance. . . . [E]ven though two of the plaintiffs are located in an area just beyond [the town proposing the ordinance] they have . . . benefited from the past

zoning ordinance and are now directly and harmfully affected by the rezoning ordinance. As property owners they are entitled to the enjoyment of their property.

*Koppel v. City of Fairway*, 371 P.2d 113, 116 (Kan. 1962); *see also* 83 AM. JUR. 2D *Zoning and Planning* § 552 (2003). For the same reasons, we conclude the court erred in excluding the Allenstown signers from the petition.

The second issue concerns which sources the town may use in determining the acreage necessary for a protest petition. In this case, the town relied, among other things, upon surveys, recorded plans, and deeds to dispute the reliability of the petition, which was based entirely upon using the scales in the town's tax maps. The court found the town's sources to be more accurate, and also noted that the "information used by the town [was] all of public record and part of the certified record and could easily have been obtained by the [petitioners]." The plaintiff asserts that the petitioners were entitled to rely exclusively upon the tax maps in making their calculations.

█ The plain wording of RSA 675:5, II(a) supports the plaintiff's argument. The statute requires only that owners identify themselves "by address of the property involved, or by lot and map number, or by whatever means is used within the town or village district to identify the land in question." RSA 675:5, II(a). The statute does not require the petitioners to prove the objective accuracy of their land area calculations. Instead, by requiring the signers to identify themselves "by whatever means is used within the town or village district to identify the land in question," it contemplates that petitioners will base their petition upon town records and tax maps. RSA 675:5, II(a); *see also Alton v. Fisher*, 114 N.H. 359, 363 (1974) (concluding that "selectmen are logical and proper officials with whom to file [protest] petitions," in part because "they have ready access to and familiarity with the tax and property ownership records of the town" and thus "are in a unique position to determine if the acreage requirements under the statute are met").

█ The town argues that the tax maps "cannot be ... reasonably expected to accurately depict each lot's size or distance from other lots," and points to language on the maps themselves that warns against using the maps for deed descriptions. State law, however, requires each city and town to keep accurate tax maps. Such maps must "[a]ccurately represent the physical location of each parcel of land," must display a "meaningful" scale that "adequately represent[s] the land contained on the map," and must be "continually updated." RSA 31:95-a, I(b), II(a), IV. While the tax

maps may fall short of the exacting standard required of individual deed descriptions, they are more than sufficient to determine whether a protest petition meets the threshold of community support required by RSA 675:5, I-a. *See Bourgeois v. Town of Bedford,* 120 N.H. 145, 147-49 (1980) (establishing substantial compliance standard for matters relating to protest petitions). Both the Farrell memo and the trial court, in fact, noted that figures used by the petitioners and the town were very close.

The town, nevertheless, argues that the statute does not prohibit the town from considering outside data to verify the accuracy of a petition's land calculations. This argument, however, would effectively nullify the statutory intent that landowners rely upon tax maps in preparing their petition. To avoid the potential invalidation of their petition, landowners would be forced to prove the accuracy of the municipality's tax maps with other data. We doubt that the legislature intended to create this contradiction. *See Monahan-Fortin Properties v. Town of Hudson,* 148 N.H. 769, 771 (2002) (statutes construed to avoid absurd or unjust results).

The town's proffered methodology would also present practical difficulties. By focusing only on the accuracy of the results, the town fails to set a standard for the drafting and verification of a protest petition. Indeed, in this case, the town derived its figures from a combination of sources, including the 1990 ordinance establishing MUD5, actual surveyed boundaries of certain properties, recorded plans, deeds, and for some lots, the same tax maps used by the petitioners. Faced with this uncertainty, a petitioner would be forced to conduct an expensive and lengthy legal inquiry in preparing a petition to avoid the possibility of invalidation. Given the relatively small window of time that may be available to landowners wishing to prepare a protest — in this case, less than two months between the approval of the amendment and the deadline for the petition — the legislature could not have intended petitioners to shoulder this burden.

Finally, the town argues that the petitioners waived this issue by failing to object to the introduction of the town's data in the superior court. In fact, the petitioners raised, and the trial court addressed, the issue of whether the town could use data unavailable to the petitioners. The court found that the information used by the town was "available" in the sense that it was "of public record . . . and could have easily been obtained by the [petitioners]." As we have already stated, however, RSA 675:5, our case law, and practical considerations all dictate that town tax maps are the only records reasonably available to protest petitioners. For this reason, we conclude that the court erred in using information outside of these records.

At oral argument, counsel for the town argued that the petitioners' calculations could be proven incorrect solely by reference to the tax maps. Because the trial court did not reach this issue, we will not decide it.

*Reversed and remanded.*

NADEAU and DALIANIS, JJ., concurred.